**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Zachery K. GRIEFEN; Forrest Gray; Michael Bowersox; Rachael Lynn Warns; Sean Ethan Gale, Defendants–Appellants.**

No. 98–30158.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1999.

Filed Jan. 12, 2000.

Gerald R. Smith, Federal Defenders of Eastern Washington and Idaho, Spokane, Washington, for the defendants-appellants.

Barry McHugh, Assistant United States Attorney, Coeur d' Alene, Idaho, for the plaintiff-appellee.

Before: LEAVY, TROTT, and T.G. NELSON, Circuit Judges.

TROTT, Circuit Judge:

The Nez Perce National Forest is located in north central Idaho east of Grangeville. It is part of our cherished national forest system and managed by the United States Forest Service through its Red River Ranger District. In accordance with government contracts, the validity of which are not involved in this case, logging and associated road building activities were scheduled to occur in the Forest during 1996. Those approved activities were part of the Jack Timber Sale and to be conducted by Shearer Lumber Products and Highland Enterprises. The removal of forest trees—or logging—was the primary purpose of this project, and the construction of roads was to facilitate that purpose. Highland's contract called for new road construction at the end of the existing Jack Creek road system to access the trees that were to be harvested.

Because of a wet spring and adverse soil conditions, however, Highland was not able to attend to its contractual road building responsibilities until late in the summer. When the time came to begin construction, and because of previous activities of persons opposed to road building and logging in the Nez Perce Forest, on July 15, 1996, officials of the Forest Service flew over the area to observe the end of the roadway where the new Jack Creek construction was to take place. They observed recent damage consisting of obstructive trenches dug across the existing roadbed, removed and plugged culverts, and a pit in the road containing large amounts of human waste. The trenches, which were hand-dug, had been hooked up to dams designed to divert water into them. Water was seen running across the road. The officials also observed barriers on the roadbed consisting of piles of slash logs, debris, and large pole and log structures. The officials observed numerous protestors in the area. The officials considered the damage they observed to be violations of Forest Service Regulations as well as impediments to the construction project that was about to begin.

Because of the obvious implications of the damaged condition of the roadbed, the trenches, and the presence of protestors with respect to commencement of the new construction, on August 3, 1996, government officials procured from Forest Supervisor Coy G. Jemmett, a Special Restriction pursuant to 36 C.F.R. § 261.50 for an area limited to the immediate site of the planned new road construction and the repair of the existing roadbed and culverts. This Special Restriction is known as a "closure order," and it specified on its face—as explicitly provided for in the Regulations—that its purposes were for public health and safety and to protect property. The precise authority for such an order came from Part 261 of 36 C.F.R. entitled "Prohibitions," and from Subpart B of that Part entitled, "Prohibitions in Areas Designated by Order"—not from Part 251 entitled, "Land Uses." As District Ranger Robert Wood testified, "[t]he closure order was designed specifically to allow the contractor to enter the area and conduct road building activities without interference and in a safe manner." ER at 257. The closure order exempted (1) persons with a permit specifically authorizing entry, (2) law enforcement, rescue, or firefighting officers in the performance of an official duty, and (3) Shearer Lumber Products and Highland Enterprises' employees and officials while performing their contractual obligations.

The closure order was tailored to cover just the area of scheduled construction activities. The order extended only to one hundred fifty feet from each side of the center of constructed and unconstructed portions of (1) Forest Roads 9553, 9553A, 9553C, 9555, 9555A, and (2) Forest Road 9550 from its junction with Forest Road 421 for a distance of 2,150 feet in a specified direction, and (3) certain relevant spurs and extensions thereof. The order was understood to expire when the construction was completed by the contractor and accepted by the Forest Service, which turned out to be a period of 45 days from the date of the closure.

Four days after Jemmett signed the Special Restriction, in the early morning of August 7, 1996, Forest Service Special Agent Mike Merkley went to the area of the closure with a group of enforcement agents, posted a copy of the order, handed copies of it to most of the protestors, and asked them to move, in a reasonable time, 150 feet away from the center of the roadbed. Merkley asked his officers to work with the protestors to gather their equipment and move from the closed area. Most of the protestors complied with the order, but not all. Those who did not were arrested and charged with crimes.

The defendants—now appellants—describe themselves as protestors who engage in activity aimed at the conduct, policies, and practices of the United States Forest Service and of the logging and trucking companies that carry out operations in the Nez Perce National Forest. They do not seriously challenge the government's factual presentation of what happened in the Forest on August 7, 1996. In this respect, the record shows each to have behaved, after being advised of the closure order, in the following manner:

Defendant Gale, who was in a raised structure over the roadbed, refused to leave both the structure and the closed area and had to be removed hours later with the help of a piece of machinery with a hydraulic attachment called a "cherry picker."

Defendant Griefen, who refused to leave another raised structure in the closed area, a structure defended by nails, was brought to earth by the removal of the legs of the structure.

Defendant Warns was similarly situated and had to be forcibly removed from her perch after she positioned herself in it so it could not be dismantled without injuring her.

Defendant Gray had to be partially cut out of a metal concoction into which he had inserted his arm and of which he would not let go. Halfway through the extraction process, Gray finally released his hold when told he could be charged with a felony for destroying government property if he did not.

Defendant Bowersox was arrested when, notwithstanding numerous warnings to leave, he insisted on entering and remaining in the closed area.

After a trial before Magistrate Judge Williams, each defendant was convicted of violating 16 U.S.C. § 551 and 36 C.F.R. § 261.53 for being in "an area closed for the protection of (e) public health or safety [and] (f) property." *Id.* Defendants Griefen, Warns, and Gale were also convicted of violating 36 C.F.R. § 261.10(a) and 16 U.S.C. § 551 for maintaining a structure on National Forest system land without authorization. They appealed their convictions to then Chief District Judge Lodge. Judge Lodge affirmed Judge Williams's Memorandum Decision of November 12, 1996 and Order of March 25, 1997. This timely appeal followed. We affirm.

## I

The defendants' appeals boil down to two colorable claims. First, that the closure order, both as applied and on its face, violated the First Amendment by operating as a prior restraint on free speech; and second, that as a matter of law, Griefen, Warns, and Gale did not "maintain" the structures that they occupied immediately before their arrests. The remainder of their claims require no discussion.[1]

## II

### First Amendment

#### A.

"[W]hen expressive conduct occurs on public grounds, like a national forest,

---

1. The issues not requiring discussion are that the closure order was a Bill of Attainder, that the defendants were entrapped by estoppel, that the magistrate judge erred in denying a short continuance to secure the presence of a peripheral witness, and that the magistrate judge erred in not permitting a defense of necessity. We have examined each of these issues and find them to be lacking in merit.

the government can impose reasonable time, place, and manner restrictions." *United States v. Johnson*, 159 F.3d 892, 895 (4th Cir.1998) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 789, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). Such restrictions are constitutionally valid if they are (1) content-neutral, (2) narrowly tailored to serve a significant governmental interest, and (3) leave open "ample alternatives for communication." *United States v. Linick*, 195 F.3d 538, 543 (9th Cir.1999) (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129–30, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)). As Justice Roberts said in *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939):

> The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

*Id.* at 515–16, 59 S.Ct. 954.

"The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *see also Wright v. Chief of Transit Police*, 558 F.2d 67, 68 n. 1 (2d Cir.1977) ("Whether or not a particular forum is a 'public forum' akin to a public street is merely a variant of the compelling interest test.").

A searching review of the record in this case reveals that the disputed § 261.50 closure order satisfies each of the three prongs of this First Amendment test. First, a thorough de novo review of the facts, *see Tucker v. California Dep't of Educ.*, 97 F.3d 1204, 1209 n. 2 (9th Cir. 1996), leaves no doubt that the closure order was content-neutral. The disputed area was open fully to the public and the

protestors until August 7, 1996, the day the contractor requested access to begin work required by a government contract. The area was closed to enable that work to take place, work which required the use of potentially dangerous heavy construction equipment. The clear purpose of the order, as explained for the Forest Service by witnesses Wood and Murphy, was for reasons of health and safety, and for the protection of property, reasons which are authorized in § 261.53 and which hold up when tested by the rest of the record. These are compelling reasons related to needs arising from proper forest management practices, and certainly represent significant government interests. As the Supreme Court explained in *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), a restriction on expressive activity is content-neutral if it is justified, i.e., based on a non-pretextual reason divorced from the content of the message attempted to be conveyed. We find this to be the case here. The restriction was for the specific purposes of honoring contractual obligations and permitting the safe construction of the road, not to silence the protestors. It excluded all members of the general public, not just the protestors. Moreover, the protestors had already shown by their destructive conduct that they presented a clear and present danger to the safe completion of the construction project, both to other persons as well as to themselves.

Second, as just explained, the closure order was issued to advance significant government interests. It was also narrowly tailored. The closure order was limited to the immediate construction area, and 150 feet on each side of the zone—which we conclude was imminently reasonable. The protestors were not ejected from the forest or even from the vicinity of the construction site, only from 150 feet to each side of the center of the work zone. Moreover, the restriction was not imposed until work was ready to begin, and it last-

ed for only 45 days, or until the project was completed.

Finally, and as we have indicated, given the spatial and temporal scope of the closure, it is clear that the protestors could continue their protest, but at a distance of 150 feet from the construction site. This tailoring left them with ample opportunities in the Nez Perce Forest and elsewhere lawfully to express their views, even though their illegal trench digging and other physically obstructive activities obviously could not continue.

The appellants cite *Bay Area Peace Navy v. United States,* 914 F.2d 1224 (9th Cir.1990), to support their claim that this closure order was not narrowly tailored. In *Bay Area Peace* we concluded that a 75 yard, or a 225 foot, safety zone between demonstrators and a scheduled parade of Navy ships failed the "narrowly tailored" test because it was wider than necessary to accomplish its purpose. *See id.* at 1228. However, we made clear that a central reason for our conclusion was the absence of any evidence whatsoever of a threat to security sufficient to render the size of the security zone reasonable. *Id.* We relied on *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), which we described as standing for the proposition that,

> when there is no evidence of obstruction, threatened injury or interference with orderly administration, a ban on carrying a sign or banner on public sidewalks surrounding the Supreme Court building fails substantially to serve the stated purpose of "protect[ing] persons and property or [ ] maintain[ing] proper order and decorum within the Supreme Court grounds."

*Bay Area Peace,* 914 F.2d at 1228. We also said, however, that should circumstances change and provide evidence of "a tangible threat to security," *id.* at 1228–29, the 75 yard security zone approved by the district court could be modified.

In the instant case, not only was the zone more narrow than in *Bay Area Peace,* but an actual threat posed by the protes-

tors and the appellants clearly existed. If anything, *Bay Area Peace* supports the position taken by the government. Faced with a clear and present threat to health and safety and property, the Forest Service appropriately established a limited security zone around the danger area. It did not close the forest, just a small part of it. This was exactly the kind of lawful security zone we had in mind in *Bay Area Peace.*

The area occupied by the protestors, and from which they were ejected, was an area temporarily subject to construction and repair. The immediate area of a construction zone is not an area that has the attributes of a public forum, or even a limited public forum, where people are entitled to exercise their rights of free speech. As the Supreme Court observed in *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Id.* at 44, 103 S.Ct. 948.

Case law informs us with examples of analogous situations where courts have held that it was proper for a government entity to close an area normally available for public expression. Most recently, we held that Oregon State University could close its campus to a person covered by court-issued stalking orders, secured by two university students who were his stalking targets. *Souders v. Lucero,* 196 F.3d 1040 (9th Cir.1999). We upheld the exclusion order on the ground that it had been issued "for the valid purpose of protecting its students, and not for conduct protected by the Constitution." *Id.* at 1046.

In so holding, we relied on *United States v. Albertini,* 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985). In *Albertini,* the Court approved of an exclusion order from a military base during an open house for Armed Forces Day of a person who was

previously barred from the base, and who had previously been convicted of conspiracy as a protestor to injure government property on the base. *Id.* at 687, 105 S.Ct. 2897. The Court noted that vandalism can hardly be characterized as activity protected by the First Amendment. *Id.* at 686, 105 S.Ct. 2897. The Court also reiterated its holding in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), that application of a facially neutral regulation that incidentally burdens speech satisfies the First Amendment if it " 'furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' " *Id.*, 472 U.S. at 687–88, 105 S.Ct. 2897 (quoting *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673).

The closure order here satisfies all aspects of this test. Although the closure order certainly put a stop to the specific expressive and obstructive activities of the defendants, it was minimally intrusive on their legitimate right to protest. Having to move 150 feet from a construction area made dangerous by illegal destructive behavior did not substantially burden the appellants' rights. As the Court said in *Community for Creative Non-Violence*, "reasonable time, place, or manner regulations normally have the purpose and direct effect of limiting expression but are nevertheless valid." 468 U.S. at 294, 104 S.Ct. 3065. Thus, we hold that the closure order was a valid time, place, and manner restriction that did not run afoul of the First Amendment, and the appellants' first challenge to the order rendering them criminally liable fails.

### B.

The appellants attack the closure order on yet another ground. They claim it was unconstitutional because Forest Service officials had too much discretion in issuing and administering it. Such latitude, they argue, runs afoul of Supreme Court cases holding that decisions about permits for parades and demonstrations cannot be left to the unbridled discretion of public officials. This attack is necessarily an attack on the facial validity of the order because the defendants did not apply for authorization to enter the closed area and thus may not argue that the scheme is unconstitutional as applied to them.

■ Appellants rely on cases involving the authorization and issuance of permits by government entities. These cases, however, are distinguishable and inapposite. The permit cases dealt with venues generally open for expressive activity, but only with the prior permission of a government licensor, or a gatekeeper, whose discretion was unbridled and unfettered. Such a permit system has been determined to be constitutionally defective with respect to areas available for expressive activity for two reasons. First, as a prior restraint, the permit process "intimidate[s] parties into censoring their own speech, even if the discretion and power are never actually abused." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Second, it empowers a governmental entity's licensing officials "to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community." *Shuttlesworth v. City of Birmingham, Alabama*, 394 U.S. 147, 153, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

The case before us, however, does not deal with the use of a portion of a forest generally open for public expression, but one temporarily and lawfully closed for repair and construction. Simply put, this is not a typical permit case. If a closure of a public forum is for a valid rather than a disguised impermissible purpose, the potential for self-imposed or government censorship discussed in *City of Lakewood* does not exist. The Forest Service's regular forest use permit system as provided

for in 36 C.F.R. Part 251, Land Uses, therefore, is irrelevant.

We have no doubt that a government entity may close areas of public forests under construction and repair, as it could temporarily close for good reasons a forest during a forest fire, a washed-out road or bridge, a crime scene during an official investigation, a street engulfed in a riot or an unlawful assembly, a terrorist-bombed public square, or the plaza surrounding the Washington Monument while the Monument is undergoing refurbishing. We also have no doubt that areas of a national forest may be closed to the public for reasons pertaining to the normal management requirements of a national forest as well as to honor contracts, the execution of which is temporarily incompatible with expressive behavior. The appellants' arguments amount to a claim that they be allowed to continue their activities during construction in the construction area. To articulate their proposition in this way is to reveal its lack of reason.

As the Supreme Court has said,
Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. *Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection.* One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or

sought by that means to direct public attention to an announcement of his opinions. As regulation of the use of the streets for parades and processions is a traditional exercise of control by local government, the question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.

*Cox v. New Hampshire,* 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (emphasis added).

A highway, a bridge, a public plaza, or any similar location that is occupied by bulldozers, cranes, roadgraders, earthmoving equipment, scaffolding, and other construction paraphernalia need not be open to the public during construction and repair, period, for expressive purposes or otherwise. The First Amendment does not command public entry under such circumstances. Indeed, for the government to allow the public into a dangerous area would be clearly a violation of the duty to protect the public from known risks. The repair of a public facility, the construction of a new one, and the protection of citizens from dangers are manifestly valid and important purposes.

Thus, because the First Amendment concerns animating the permit cases cited by the Appellants do not exist here, the teaching of those cases is not apposite. Cessante ratione legis, cessat et ipsa lex (The reason of the law ceasing, the law itself also ceases). In First Amendment terms, the fact that discretion to authorize entry to a closed area may be unfettered during construction is of no concern. The process of granting authority to enter a lawfully closed zone differs markedly from the process of licensing expressive activity. Such a process does not "engender identifiable risks to free expression. . . ." *City of Lakewood,* 486 U.S. at 757, 108 S.Ct. 2138.

■ Based on the foregoing, including our determination that the closure order was valid, we conclude that the appellants' facial challenge to this closure order on First Amendment grounds simply because Forest Service officials had broad discretion in deciding who could enter the closed area must fail. *City of Lakewood* distinguishes carefully "laws that are vulnerable to facial challenge from those that are not." *Id.* at 759, 108 S.Ct. 2138. The test that distinguishes the two categories is whether the statute, or the law, raises the specter of (1) self-censorship, or (2) difficulties of detecting, reviewing, and correcting content-based censorship. *Id.* "Therefore, a facial challenge lies wherever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers. . . . The law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id.* We do not find such a nexus in a closure order context where the closure order itself is non-pretextual and otherwise passes constitutional muster.

*City of Lakewood* cites *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), and *Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948), as contrasting examples of First Amendment cases illustrating (1) the differences between prohibition cases (*Kovacs*) and licensing cases (*Saia*); and (2) when a facial challenge is proper (*Saia*), and when it is not (*Kovacs*). *City of Lakewood* confirmed the validity of *Kovacs'* holding that—the First Amendment notwithstanding—certain types of expressive activities, i.e., sound trucks, may be barred altogether, even though those activities are a means of expression. *Id.* at 755–56, 69 S.Ct. 448. In *Kovacs,* the court quoted extensively from *Schneider v. State of New Jersey,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939):

> Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated. So long as legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets. For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion.

*Kovacs,* 336 U.S. at 89 n. 13, 69 S.Ct. 448 (quoting *Schneider,* 308 U.S. at 160–61, 60 S.Ct. 146). On the other hand, *Saia* held that an ordinance subjecting the use of sound trucks to a standardless permit system is amenable to a facial challenge because of the attendant risk of censorship, both self-imposed and official. *See Saia,* 334 U.S. at 562, 68 S.Ct. 1148.

The C.F.R. regulatory scheme associated with entry to closed areas in national forests does not pose substantial risks of censorship, nor does it raise the real possibility of disguised action. Unlike the statute in *City of Lakewood,* periodic renewals of permits is not an issue in this case, and the authorization process with respect to a closed area does not threaten lawful expressive activity. Once the forest is closed, it is closed to the ordinary uses of the forest. Forest closure laws easily fit

the category of "laws of general application that are not aimed at conduct commonly associated with expression and ... carry with them little danger of censorship." *City of Lakewood,* 486 U.S. at 760–61, 108 S.Ct. 2138. This case does not involve our usual concerns about licensing based on unbridled and standardless discretion.

Our holding does not imply that an order that closes a public forum is sacrosanct. Should it appear that the true purpose of such an order was to silence disfavored speech or speakers, or that the order was not narrowly tailored to the realities of the situation, or that it did not leave open alternative avenues for communication, the federal courts are capable of taking prompt and measurably appropriate action. Anyone aggrieved by such an order, or for that matter by any order infringing on free speech, has immediate access to the federal courts to advance his or her grievances. *Bay Area Peace* illustrates the availability of an adequate judicial forum to resolve these disputes, and of the standard legal tools—such as temporary restraining orders and injunctions—we use to enforce our rulings. *See Bay Area Peace,* 914 F.2d at 1228. Here, if the appellants had a legal problem with the scheduled road building or the logging, the rule of law provided them with an avenue to do something about it. Moreover, they could have continued on August 7, 1996 and immediately thereafter to protest and to take their case to the public, to the newspapers, to their legislators, and even to the onsite loggers and road construction workers—they just could not do so in the path of tractors and earth movers.

## IV

### Maintaining a Structure

The district court held that the appellants violated 36 C.F.R. § 261.10(a). The regulation prohibits:

(a) *Constructing, placing, or maintaining any* kind of road, trail, structure, fence, enclosure, communication equipment, or other improvement *on National Forest system land* or facilities without a special-use authorization, contract, or approved operating plan.

36 C.F.R. § 261.10(a) (emphasis added).

▮ It is undisputed that the incidents occurred on National Forest land. It is also undisputed that the appellants did not have authorized permits for the structures as required under the regulation. However, the appellants argue that their conduct did not constitute "maintaining a structure" as required under 36 C.F.R. § 261.10(a) because (1) "maintain" requires more than mere possession of, or occupation of, a structure; and (2) the word "maintain" is ambiguous and therefore the rule of lenity and the void-for-vagueness doctrine require reversal. We respectfully disagree.

The word "maintain" is neither vague nor cryptic. In any dictionary in common usage it means to continue or carry on, to preserve or keep in a given condition, and to defend, as against danger or attack. *See* Webster's II New Riverside University Dictionary 717 (1984); *see also United States v. Clavis,* 956 F.2d 1079, 1091 (11th Cir.1992) ("Acts evidencing such matters as control, ... acquisition, ... supervising, protecting, ... are ... evidence of knowingly maintaining the place....").

The purpose of 36 C.F.R. § 261.10(a) is to prevent the impeding of Forest Service roads. The district court found that the appellants were instrumental in the placement of the structures and of integral parts of the structures, and that their purpose was to maintain the structures so as to impede traffic. The district court then concluded that the appellants maintained the structures "by staying in them after being asked to leave, thereby preventing the Forest Service officers from removing the structures." The appellants argue that they simply occupied the structures but did not maintain them.

In *United States v. Scranton,* 25 F.Supp.2d 1131, 1132 (D.Idaho 1997), a

Defendant was charged with maintaining a structure, specifically a tripod, on Forest Service Road 9553 without proper authorization in violation of § 261.10(a). In a published opinion, the district court held that "Defendant's affirmative refusal to leave the tripod 'maintained' the structure under the plain meaning of the word." *Id.* The court concluded that the "obvious purpose of the Defendant's conduct was to *maintain the position of the structure* in the middle of the roadway." *Id.* (emphasis added).

In the instant case, the appellants were asked several times to leave the structures voluntarily and told they would be arrested if they did not. They refused and remained in the structures, defending and protecting them against the law. As a result, law enforcement officers were forced to remove the appellants from the structures and disassemble the structures before logging contractors could safely proceed with their work. This uncontested evidence establishes that Appellants were intent on maintaining the positions of the structures to protest and block the logging operations.

Appellants also argue that the word maintain is ambiguous and therefore the rule of lenity mandates reversal. Not true. The rule of lenity is " 'not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the' regulation." *Scranton,* 25 F.Supp.2d at 1132 (quoting *United States v. Butler,* 74 F.3d 916, 924 (9th Cir.)), *cert. denied,* 519 U.S. 967, 117 S.Ct. 392, 136 L.Ed.2d 308 (1996). In *Scranton,* the district court held that the language of 36 C.F.R. § 261.10(a) was not ambiguous. *Id.* Based on the logic of the decision in *Scranton,* which we now adopt, the rule of lenity should not apply. The regulation's language does not contain a grievous ambiguity, nor is the purpose of the regulation uncertain.

Finally, the appellants argue that the void-for-vagueness doctrine bars their conviction because the meaning of the word "maintain" is not clear. "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). We conclude that this argument fails.

AFFIRMED.