NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

DEC 21 2020

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| FREEDOM FOUNDATION, | No. 20-35007 |
| Plaintiff-Appellant, | D.C. No. 3:18-cv-05548-RBL |
| v. | |
| WASHINGTON DEPARTMENT OF ECOLOGY, ET AL., | MEMORANDUM* |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted October 9, 2020
Seattle, Washington

Before: HAWKINS, GILMAN,** and CALLAHAN, Circuit Judges.
Dissent by Judge CALLAHAN

Freedom Foundation appeals the denial of its motion for summary judgment

and grant of summary judgment to the Washington Department of Ecology, et al.

---

\* This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

** The Honorable Ronald Lee Gilman, United States Circuit Judge for the
U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

("Ecology"). Freedom Foundation asserts that Ecology has maintained and enforced speech restrictive policies that deprive Freedom Foundation of its right to free speech under the First Amendment by prohibiting Freedom Foundation from canvassing in Ecology's lobby. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

There was no error in determining that Ecology's lobby is a nonpublic forum, as it is clear that Ecology did not intend to open its lobby to public visitors. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985) ("The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse."). To ascertain the government's intent, we assess "the nature of the property and its compatibility with expressive activity" and "the policy and practice of the government." *Id*.

The physical structure of Ecology's lobby is not conducive to expressive activity. Ecology's statewide headquarters consists of a three-story building that houses Ecology's employees and staff for three tenant agencies. The lobby is partitioned into various units, including a reception and security area, work cubicles, seating for visitors, and a walkway connecting two locked workspaces.

Ecology's policies similarly indicate that the lobby is not open for public communication. Such policies require visitors to sign in, state the reason for their visit, and receive a badge before accessing the lobby. Both employees and visitors

2

are generally prohibited from using the lobby to promote a commercial enterprise or solicit for outside organizations. Ecology employees must receive administrative approval before hosting public hearings or events that invite outside organizations into the lobby. Ecology strictly enforces these policies and has prohibited outside organizations, such as the Sierra Club and Olympia Coffee Roasting Company, from protesting, soliciting, and leafletting in the lobby. *See Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1886 (2018) (holding that a polling place is a nonpublic forum because "[r]ules strictly govern who may be present, for what purpose, and for how long"). Ecology's lobby is therefore a nonpublic forum.

In nonpublic forums, speech restrictions need only be reasonable and not discriminate based on the speaker's viewpoint to pass constitutional muster. *Id.* at 1885. Freedom Foundation, on this record, has not established that Ecology's speech restrictive policies are unreasonable or viewpoint discriminatory. Ecology may reasonably reserve its lobby for communication about Ecology business and its policies provide substantial alternative channels for outside organizations to canvass in the plaza directly outside the lobby and the street next to the building. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 50, 53–54 (1983). Moreover, the discretion Ecology officials do have in enforcing Ecology's speech restrictive policies is "guided by objective, workable standards." *Mansky*, 138 S. Ct. at 1891. Upon an employee's request to invite an outside organization or charity

into the lobby, Ecology officials determine whether extending that invitation is connected to a specific, work-related or charitable activity authorized by the State legislature.[1]

There is also no evidence of disparate treatment in Ecology's application of its speech restrictive policies. Freedom Foundation argues that Ecology's enforcement of its speech restrictive policies is viewpoint discriminatory because Ecology has granted access to other organizations, such as Intercity Transit, Joy Ride Bikes, and the Washington Federation of State Employees (the "WFSE"),[2] while rejecting Freedom Foundation. But the organizations that Ecology has welcomed into the lobby fit within Ecology's permissible and workable policies; they are

---

[1] Freedom Foundation relies heavily on *Swart v. City of Chicago*, 440 F. Supp. 3d 926 (N.D. Ill. 2020), to argue that Ecology's speech restrictive policies are unreasonable because they are open to broad enforcement discretion. Insofar as we would rely on an out-of-circuit case that is nonprecedential, *Swart* is not applicable as it involved a challenge to speech restrictive policies at Chicago's Millennium Park, a traditional public forum. *See id.* at 930–31, 937.

[2] Ecology is subject to the collective bargaining agreement (the "CBA") between the State of Washington and the WFSE. In accordance with the CBA, Ecology allows the WFSE to use the lobby for representational activities subject to advance approval. This differential access for the WFSE versus Freedom Foundation to speak about labor relations is lawful under *Perry* because the WFSE is the exclusive bargaining representative of unionized employees at Ecology. *See Perry,* 460 U.S. at 50–52 (holding that it was reasonable for a school to grant access to its teachers' exclusive bargaining representative while denying access to a rival union because the exclusive bargaining representative had an official responsibility to its teachers unlike the rival union).

connected to a specific, work-related or charitable activity authorized by the State legislature, and they have undergone Ecology's application process and its practice of screening the information that invited organizations may share. *See Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 833 (1995) ("[W]e have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message."); *Perry*, 460 U.S. at 50–51 (holding that a school district had a legitimate interest in "preserving the property for the use to which it is lawfully dedicated") (quoting *USPS v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129–30 (1981)) (cleaned up). For example, upon receiving administrative approval for their visits, Ecology employees welcomed Intercity Transit and Joy Ride Bikes to share information about efficient commute options in connection with implementing Ecology's commute trip reduction program. By contrast, Ecology denied lobby access to the Sierra Club, which wanted to use the lobby to stage a protest, and to Olympia Coffee Roasting Company, which wanted to host a coffee tasting, because those organizations' activities—like Freedom Foundation's leafletting—did not align with Ecology's policies.

Freedom Foundation additionally highlights a conversation, involving Ecology's security guard, that occurred during its 2015 canvassing attempt as evidence that Ecology engaged in viewpoint discrimination. But the remarks of

5

Ecology's security guard, an employee of an independent company providing building security services and not a municipal employee or a final policymaker for Ecology, about lobby access or otherwise cannot be imputed to Ecology under 42 U.S.C. § 1983. *See Barone v. City of Springfield, Oregon*, 902 F.3d 1091, 1106–07 (9th Cir. 2018). Further, the undisputed record evidence demonstrates that not "everyone" is allowed access to the lobby and, in fact, at least two organizations (the Sierra Club and Olympia Coffee Roasting Company) aside from Freedom Foundation have been denied such access.

Freedom Foundation further argues that Ecology's revision to its policies shortly after Freedom Foundation's initial canvassing attempt constitutes circumstantial evidence of viewpoint discrimination. But Ecology's revision, even when viewed most favorably to Freedom Foundation, was created in reaction to Freedom Foundation's security breach and simply served to clarify what had always been true—that visitors, like Ecology employees, are prohibited from using state resources to support outside organizations. Thus, Freedom Foundation has failed to demonstrate that Ecology's speech restrictive policies violated its First Amendment rights.

**AFFIRMED.**

6

*Freedom Foundation v. Wash. Dep't of Ecology, et al.*, **No. 20-35007**

CALLAHAN, Circuit Judge, dissenting:

Governments rarely target a speaker's viewpoint outright.  For this reason, we must take care to ensure that policies and actions that appear neutral on their face are not, in reality, "a facade for viewpoint-based discrimination."  *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 811 (1985). Because the record here raises a triable inference of just such discrimination, I dissent.

This case concerns two attempts by Freedom Foundation to distribute anti-union materials in Ecology's lobby.  In 2015, during the first attempt, a security guard welcomed the canvassers, believing them to be from the union.  This warm reception cooled, however, when the guard learned the visitors' actual affiliation. "We have a good relationship with our union," he told them, "and they don't want you here."  But, he added, they could leaflet in the lobby, since "everybody leaflets" there "all the time."  Called to address the situation, Ecology's human resources director initially told the visitors that they needed to leaflet outside, but she, too, eventually indicated that they could do so in the lobby.  Then, in 2017, Ecology barred outright Freedom Foundation's second attempt to use the lobby for leafletting.  The agency based its position on a newly adopted policy prohibiting

visitors from "promot[ing] or solicit[ing] for an outside organization or group" in agency facilities.

Yet as Ecology readily admits, it adopted this policy in direct response to Freedom Foundation's 2015 visit, which itself raises red flags of viewpoint discrimination. Although governments may restrict previously granted access, courts can act when "the true purpose of such an order was to silence disfavored speech or speakers." *United States v. Griefen*, 200 F.3d 1256, 1265 (9th Cir. 2000); *see also Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365 (D.C. Cir. 2018) ("For the Government to change the nature of a forum in order to deny access to a particular speaker or point of view surely would violate the First Amendment."). Here, the timing of the policy, combined with the circumstances surrounding the 2015 leafletting attempt, circumstantially supports the notion that Ecology simply had no desire to entertain Freedom Foundation's opinions.

Also notable is that Ecology allows the employees' union to use agency facilities for its events, including for discussing *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018)—the very topic on which Freedom Foundation sought to leaflet. While the union is by contract the employees' bargaining representative, *see Perry v. Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 51 (1983), not all of its activities clearly qualify as representational. For example, the record

2

indicates that a membership drive may have occurred in the lobby at some point prior to Freedom Foundation's 2015 visit. Given that differential treatment can itself raise an inference of viewpoint discrimination, summary judgment was premature.

Ecology's explanations fail to convince me otherwise. The agency contends that in revising its policy it was only making explicit its longstanding position that outsiders cannot use the lobby. It claims that such a policy is needed to minimize disruption.[1] Why, then, could "everybody" previously leaflet there "all the time"? And why did the human resources director suggest that Freedom Foundation could, in fact, leaflet there in 2015? Furthermore, even though Ecology describes its policy as limiting lobby activities to agency business, as written the rule applies only to those—like Freedom Foundation's canvassers—who use the lobby on behalf of outside groups. It says nothing of individuals acting on their own behalf, who would presumably pose the same concerns as the canvassers. *See Griefen*, 200 F.3d at 1265 (flagging as problematic orders that are "not narrowly tailored to the realities of the situation"). These discrepancies raise questions that should have

---

[1] Ecology also claims that it revised its policy in response to a "security breach" that occurred during Freedom Foundation's 2015 visit. The majority accepts Ecology's characterization of what transpired, but the record reveals that the situation was quite mild: one leafletter, believing he had access to the building due to the guard's representations, wandered into an employee-only area before being escorted out.

3

been further explored. In the end, drawing all justifiable inferences in Freedom Foundation's favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the record presents sufficient smoke to survive summary judgment. I therefore dissent.