361 F.3d 1134
 Bernie GALVIN, Sister; Ken Butigan; Jeff Johnson, Rev.; Karen Oliveto, Rev., for themselves and others similarly situated, as a Class, Plaintiffs-Appellants,
v.
Kevin HAY, Lieut.; Hugh Irwin, Major of the United States Park Police, and the United States, Defendants-Appellees.
 No. 00-17425.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 17, 2002.
 Filed March 18, 2004.
 
 COPYRIGHT MATERIAL OMITTED Dennis Cunningham, San Francisco, CA, for the plaintiffs-appellants.
 Robert M. Loeb and Douglas Hallward-Driemeier, Department of Justice, Civil Division, Appellate Staff, Washington, DC, for the defendants-appellees.
 Appeal from the United States District Court for the Northern District of California; Charles R. Breyer, District Judge, Presiding, D.C. No. CV-99-04529-CRB.
 Before HUG, JR. and BERZON, Circuit Judges, and LASNIK,* District Judge.
 OPINION
 BERZON, Circuit Judge.
 
 BACKGROUND
 
 1
 On March 9, 1997, members of the advocacy association Religious Witness with Homeless People (RWHP) conducted a protest at the San Francisco Presidio National Park (the Presidio). The demonstrators opposed a plan by the National Park Service, which administers the Presidio, to tear down 466 units of former army housing at the site, known as the Wherry Housing. The Park Service proposed restoring the area to its natural environment. RWHP campaigned for the Park Service to convert these units instead into housing for San Francisco's poor and homeless. To promote its cause, RWHP had staged three prior sit-ins at the Wherry Housing units that led to members' arrests and prosecutions for trespass.
 
 
 2
 The group's fourth demonstration is the centerpiece of this case. Shortly before March 9, lead plaintiff Sister Bernie Galvin was in contact with the United States Park Police to discuss a permit for RWHP's planned demonstration.[1] Defendant Lieutenant Kevin Hay of the Park Police refused to allow RWHP members to conduct a march through the Presidio unless they promised not to engage in civil disobedience. Sister Bernie did not agree to this condition. Instead, on March 9, 150 to 200 RWHP members gathered at the Presidio site on a lawn in front of a building containing both the Park's administration offices and a Visitor Center. The building was located some distance away from the Wherry Housing. Reverend Karen Oliveto described the purpose of the protest as being to "have a witness that is highly visible so that we can draw attention to the Wherry Housing." The Park Police had prepared for the demonstration by assembling a protective force that included mounted officers.
 
 
 3
 Sister Bernie and other members of RWHP were again informed by Hay that unless they promised not to engage in civil disobedience, no permit would be issued for their planned march. The demonstrators again refused to make this bargain. They unfurled banners, set up a portable public address system, and began a prayer service. The police promptly informed the demonstrators that if they did not move to a location 150 to 175 yards away designated as a "First Amendment area"[2] and marked out with a circle of orange traffic cones, they would be arrested. Some of the protestors complied and moved off the lawn, either to the designated area or toward a parking lot much closer than that area but separated from the lawn by a street. Eighty-three protestors remained and were arrested. Sister Bernie attempted to speak with the media but was told to leave the lawn by defendant Major Hugh Irwin, the ranking commander of the Park Police present. When she failed to do so Sister Bernie was arrested.
 
 
 4
 Sister Bernie testified at the protestors' criminal trial[3] that the reason she and other protestors did not agree to move to the "First Amendment area" was because "[w]e are Religious Witness, and witness means that we proclaim that this is an unjust situation. For us to witness in closet [sic] or a closed door or in a remote area is not to permit us to witness at all." Father Louis Vitale, another protest leader, added that the "First Amendment area" was "down in the boonies. It was down in the overgrowth area.... We said we want to inform. That's really why we had come there, to present our case ... and going off in the corner of a parking lot somewhere didn't make any sense."
 
 
 5
 Most of the eighty-three persons arrested were subsequently convicted of demonstrating without a permit in violation of 36 C.F.R. § 2.51. Those convicted appealed to this court, which reversed the convictions and held that the arrests violated the demonstrators' First Amendment rights. United States v. Baugh, 187 F.3d 1037 (9th Cir.1999). The plaintiffs here, who are four of the arrested protestors, then sued Hay and Irwin and their employer, the United States, on behalf of a class composed of all the March 9, 1997 demonstrators.[4] They alleged constitutional tort claims under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), as well as claims for false arrest under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 et seq.
 
 
 6
 The district court dismissed all of the plaintiffs' claims. In its first order, the district court granted the defendants' motion to dismiss the FTCA cause of action and most of the Bivens claims. In November 2000, after the parties agreed to a stipulation of facts, the district court granted, on qualified immunity grounds, defendants' motion for summary judgment concerning the alleged constitutional tort arising from defendants' dispersal of the prayer service. The court held:
 
 
 7
 [A] reasonable officer in the defendants' position could believe that his conduct was lawful because he could believe that the NPS restrictions were narrowly tailored to serve the NPS's interests in maintaining the park and protecting its users ... for a variety of reasons. First, the right to an unconditional permit was not clearly established in March 1997, so as far as these defendants knew, the no-trespassing condition was a reasonable way to be sure that RWHP's speech would not undermine NPS's interests. Second, the plaintiffs could have received permission to demonstrate either at the Visitor Center lawn or in the parking lot across the street by agreeing to the no-trespassing condition or by requesting a floating permit. Third, a floating permit would be narrowly tailored, because such a permit allows speakers to engage in expressive activity until the activity begins to harm the NPS's interests.
 
 The district court further held:
 
 8
 [A] reasonable officer in the defendants' position could have believed ... that the First Amendment area was an ample alternative channel for RWHP to communicate their ideas. Several factors lead the Court to that conclusion. First, the officers were explicitly told that the First Amendment area was the designated location for protest activity. Such a direct instruction from supervisors would have led a reasonable officer to believe that he was acting lawfully.... Second, the officers knew that they could have granted a floating permit at RWHP's request. If RWHP had asked for a floating permit to demonstrate in the parking lot across the street from the Visitor Center and the officers had denied that request, a reasonable officer in that situation could not believe that the First Amendment area was an ample alternative. However, since the plaintiffs did not ask to move their protest into the parking lot, a reasonable officer could believe that the predesignated First Amendment area was an ample alternative. Third, the location of the First Amendment area relative to the Visitor Center was not so inadequate that a reasonable officer would necessarily have viewed the area as an insufficient channel for RWHP to communicate their views.
 
 
 9
 The plaintiffs appeal all aspects of the dismissal of their lawsuit. Viewing the evidence in the light most favorable to the nonmoving party, RWHP, and drawing all reasonable inferences in favor of that party, we must determine whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact. Balint v. Carson City, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc).
 
 DISCUSSION
 * Qualified Immunity
 
 10
 Qualified immunity analysis proceeds in two stages. We must first inquire whether the plaintiffs have established a constitutional violation. If this threshold is passed, we examine whether defendants' actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quotation marks and citation omitted). The clearly established test is met if "in the light of pre-existing law the unlawfulness [is] apparent." Id. (quotation marks and citation omitted) (emphasis added). Even in the context of clearly established law, "[i]f the officer's mistake as to what the law requires is reasonable ... the officer is entitled to the immunity defense." Saucier v. Katz, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).
 
 
 11
 There are two discrete constitutional violations alleged by the plaintiffs: (1) the denial of a march permit without a concomitant promise on their part not to engage in civil disobedience; and (2) the dispersal of the prayer service that began as an alternative to the march. We examine these claims in turn.
 
 A. The denial of the permit
 
 12
 Plaintiffs ask us to reverse the district court's ruling that, although Baugh held that it was constitutionally impermissible to require RWHP to promise not to engage in civil disobedience in return for a permit, the law on this issue was not clearly established at the time defendants acted. We decline to do so. We agree with the district court that, before Baugh, the contours of the constitutional right violated by the defendants' denial of the permit were not "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope, 536 U.S. at 739, 122 S.Ct. 2508 (quotation marks and citation omitted).
 
 
 13
 Plaintiffs cite Collins v. Jordan, 110 F.3d 1363 (9th Cir.1997) (as amended), decided before the incidents at issue in the current case, in support of their argument that the Baugh holding was sufficiently foreordained to constitute pre-existing law that a reasonable officer would have followed. Collins held that "the law is clear" that, in the days immediately following the Rodney King verdict, San Francisco could not impose a city-wide ban on public demonstrations "simply because prior similar activity led to or involved instances of violence." Id. at 1372. Instead, "[t]he courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." Id. (citations omitted). Relying on Collins, Baugh held that Hay and Irwin violated the Constitution by conditioning a permit on a no-trespassing promise because similar demonstrations led to trespasses in the past. See Baugh, 187 F.3d at 1043-44.
 
 
 14
 In Collins, however, San Francisco had imposed a total ban on demonstrations. In this case, the Park Police imposed a conditional limitation and were willing to grant the permit had the condition been accepted. Baugh viewed the proposed condition as a time, place, and manner restriction and analyzed it as such. 187 F.3d at 1043. In contrast, because it involved a total ban, Collins did not consider San Francisco's demonstration ban under the time, place, and manner rubric. Baugh was therefore the first case to consider whether a permit conditioned on an agreement to refrain from illegal activity imposes a valid time, place, and manner restriction in a public forum or, instead, an unconstitutional restriction on freedom of speech.
 
 
 15
 Baugh applied standards applicable to public fora like the Presidio, because "a public park, such as the Presidio, represents a quintessential public forum." 187 F.3d at 1042 (quotation marks and citation omitted). Permissible restrictions on expression in public fora must be content-neutral, be narrowly tailored to serve an important governmental interest, and leave open ample alternative channels for the communication of the message. Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Baugh found that the restrictions imposed by the defendants were content-neutral, 187 F.3d at 1043, but not sufficiently narrowly tailored to meet the second prong of the time, place, and manner standard: that the limitation "not burden substantially more speech than necessary to further the [government's significant] interests." Id. We reached this conclusion in Baugh because (1) the organizers could not warrant in good faith that all the demonstrators would comply with the law; and (2) the Park Service could have more narrowly tailored its restriction by issuing the permit and then arresting the demonstrators if and when they trespassed. Id. at 1043-44.
 
 
 16
 Baugh's conclusions have firm support in the case law relied upon. Nonetheless, there was no case at that juncture that had addressed the question whether conditioning a march permit on a promise to abide by the law when there was a history of organized civil disobedience by the same group along the same route is an insufficiently tailored manner restriction.
 
 
 17
 The Park Police's determination to impose the condition, while mistaken under the First Amendment, was at the time (although it would not be now) a legal error that reasonable officials could make in light of then-existing precedents. Nor, as in Hope, where "[a]rguably, the violation was so obvious that [the Court's] own Eighth Amendment cases gave the respondents fair warning that their conduct violated the Constitution," 536 U.S. at 741, 122 S.Ct. 2508, was the invalidity of imposing the restriction at issue self-evident, even in the absence of "fundamentally similar" precedents. See id. An official charged with enforcing the trespassing law and faced with a group that had engaged in prior unlawful activity could well think that conditioning another permit on promises to refrain from unlawful acts would allow legal but not illegal activity and thus protect First Amendment rights.
 
 
 18
 We conclude that the district court was correct in granting defendants' motion for summary judgment for the permit denial on the ground of qualified immunity.
 
 B. The dispersal of the prayer service
 
 19
 Applying the two-prong Saucier qualified immunity standard to the second claim of constitutional violation before us, the dispersal of the prayer service, is less straightforward. As will appear, Baugh did not decide on the merits this First Amendment issue as it is presented now, so we must first inquire for ourselves whether the plaintiffs have proven a constitutional violation. Only if we answer that question in the affirmative — which we do — can we then turn to the second issue, whether "in the light of pre-existing law the unlawfulness [is] apparent." Hope, 536 U.S. at 739, 122 S.Ct. 2508.
 
 
 20
 1. First Amendment Protection Accorded Choice of Location of Speech
 
 
 21
 As Baugh recognized, "the First Amendment applies with particular force here," because "[p]arks ... have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." 187 F.3d at 1042 (quoting Grossman v. City of Portland, 33 F.3d 1200, 1204-05 (9th Cir.1994), in turn quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.)). As a restriction of speech in a "quintessential public forum," id. (quoting Grossman, 33 F.3d at 1204), the relegation of the prayer service to the "First Amendment area," like the conditioning of a permit on a promise not to engage in civil disobedience, was constitutional only if it was a reasonable time, place, and manner restriction on speech. See, e.g., Ward, 491 U.S. at 791, 109 S.Ct. 2746.[5]
 
 
 22
 The way in which the prayer service issue is presented with regard to qualified immunity in this case implicates a slightly different time, place, and manner issue from the one we most often encounter: "The propriety of a place for use as a public forum does turn on the relevance of the premises to the protest, but this relation may be found in two ways. In some situations the place represents the object of protest, the seat of authority against which the protest is directed. In other situations, the place is where the relevant audience may be found." Wolin v. Port of N.Y. Auth., 392 F.2d 83, 90 (2d Cir.1968) (citations omitted).
 
 
 23
 In most cases concerning time, place, and manner restrictions on protest activity in public fora, including most recent cases from this court, the demonstrators or leafletters are trying to present their point of view to an audience composed of individuals who gather at the site in question, the second Wolin category. Either the location is one where many people habitually gather, providing an inexpensive way for individuals with a message to communicate to reach a general audience composed of a cross-section of their community,[6] or the location is one at which the particular audience the speaker seeks to reach is present.[7]
 
 
 24
 Bay Area Peace Navy v. United States, 914 F.2d 1224 (9th Cir.1990), heavily relied upon by the plaintiffs in this case, is of the latter variety. "[T]he Peace Navy, a non-profit association dedicated to using small boats for peaceful anti-war and anti-militarization demonstrations ... engaged in a counter-demonstration during Fleet Week by parading in formation in front of the invited guests on the pier during the parade of real Navy ships farther out in the Bay." Id. at 1225-26. The intended audience was the group of invited individuals who were interested in the Navy procession and therefore, the demonstrators apparently presumed, harbored views about the importance of military preparedness different from those of the demonstrators. We considered whether a restriction preventing the Peace Navy from getting within 75 yards of their intended audience was a valid time, place, and manner restriction on speech, and held that it was not. The restriction did not leave the speakers with an ample alternative for communicating their message to the intended audience, the last prong of the time, place, and manner analysis as traditionally stated. Id. at 1229. From 75 yards away the audience could neither see the protestors' banners nor hear their singing. Id. at 1226. See generally Kevin Francis O'Neill, "Disentangling the Law of Public Protest," 45 LOY. L. REV. 411, 443-47 (1999).
 
 
 25
 In this case, however, despite plaintiffs' heavy reliance on Bay Area Peace Navy, it has become clear that they were not trying to communicate with an on-site audience. Plaintiffs' complaint noted that "there was no vehicle traffic to speak of in that area or the park as a whole at that time[and] that next to no one was visiting the visitors center." Consistent with this representation, counsel stated at oral argument: "[N]obody's there. It's a Sunday. It's the thing, the symbolic presence in front of the building ... which is the seat of the power they're protesting against, is important.... They just thought they can have this prayer service ... an observance, a witness that they do in front of the seat of power." When it was suggested to counsel that "[t]here's no audience here that was being denied the message," he replied: "That's sort of true.... [t]here weren't people around."[8] Plaintiffs' opening brief corroborates this statement: "[T]he park was dead empty and quiet that whole day."
 
 
 26
 That the protestors selected the location of their "witness" within a traditional public forum area not because of the audience present but because of the significance of the location for the content of their message does not detract from their strong First Amendment interest in speaking at the place they chose. In common experience, speakers rely upon location to inform the content of their speech. Television news reporters, for instance, routinely travel to locations that are illustrative of their stories even though they could read the same texts from their studios. Doing so does not change their intended audience. But speaking in front of a relevant back-drop gives greater force to the messages conveyed to that audience.
 
 
 27
 In other instances, as here, the significance of the location is primarily relevant to the speakers themselves, affecting the shared meaning of the ceremony for its participants. Cf. White House Vigil for the ERA Comm. v. Clark, 746 F.2d 1518, 1533 (D.C.Cir.1984) ("[T]he White House area is a unique situs for first amendment activity...." (quotation marks omitted)); Tatum v. Morton, 562 F.2d 1279, 1280 (D.C.Cir.1977) ("[P]laintiffs participated in a peaceful Quaker vigil of prayer on the White House sidewalk. The purpose of the vigil was `to hold Richard Nixon in the light' in the hope that the government's war policies in Vietnam would thereby be altered."). Vietnam veterans' associations, for example, are likely to gather for services of memorial and remembrance in front of the Vietnam Veterans memorial in Washington, while relatives of September 11th victims gather at Ground Zero and await construction of a memorial at that site. For both groups, the significance of the location does not arise from a desire to reach an audience gathered there, or to appear on the evening news with the memorial as a backdrop. Rather, their mourning and communal messages of respect have more — and different — meaning at a particular public place.
 
 
 28
 As these illustrations show, individual choice of both communicative aspects, message and manner of presentation, is critical. The Supreme Court has so recognized, making clear that "[t]he First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781, 790-91, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). It is therefore the "general rule" that "the speaker has the right to tailor the speech." Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 573, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995); see also Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) ("[I]t is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual."). Messages can be inchoate, see Hurley, 515 U.S. at 569-70, 115 S.Ct. 2338 ("a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech"), and can depend on a speaker's own, internal understandings of his or her message. See, e.g., W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 632-33, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ("A person gets from a symbol the meaning he puts into it, and what is one man's comfort and inspiration is another's jest and scorn.").
 
 
 29
 The Court has recognized that location of speech, like other aspects of presentation, can affect the meaning of communication and merit First Amendment protection for that reason. In City of Ladue v. Gilleo, the question was whether citizens may display message-carrying signs from their own residences. Said the Court:
 
 
 30
 Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means.... A sign advocating "Peace in the Gulf" in the front lawn of a retired general or decorated war veteran may provoke a different reaction than the same sign in a 10-year-old child's bedroom window or the same message on a bumper sticker of a passing automobile. An espousal of socialism may carry different implications when displayed on the grounds of a stately mansion than when pasted on a factory wall or an ambulatory sandwich board.
 
 
 31
 512 U.S. 43, 56, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994); see also Million Youth March, Inc. v. Safir, 18 F.Supp.2d 334, 348 (S.D.N.Y.1998) (relying on City of Ladue for the proposition that plaintiff's choice of Harlem as the location of a protest march is of significance in First Amendment analysis because "Harlem enjoys a unique place in the African-American experience," such that "[h]olding the event in that location will infuse substantial and unique additional meaning to the message of the event"); Nationalist Movement v. City of Boston, 12 F.Supp.2d 182, 192 (D.Mass. 1998) (relying on City of Ladue as "recogniz[ing] that the specific place where a message is communicated may be important to the message and, consequently, of constitutional significance," because "the location[may] be an essential part of the message sought to be conveyed"); cf. S. Boston Allied War Veterans Council v. City of Boston, 297 F.Supp.2d 388, 397 (D.Mass.2003) ("[T]he location of speech is often vitally important to its message." (citing Nationalist Movement)).
 
 
 32
 As speakers may generally control the presentation of their message by choosing a location for its importance to the meaning of their speech, they may ordinarily — absent a valid time, place, and manner restriction — do so in a public forum. The public forum doctrine stems from the recognition that "one who is rightfully [in a public forum] carries with him there as elsewhere the constitutional right to express his views in an orderly fashion." Jamison v. Texas, 318 U.S. 413, 416, 63 S.Ct. 669, 87 L.Ed. 869 (1943).[9] "Elsewhere" — using one's own resources and facilities — the First Amendment protects expression both "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," New York Times v. Sullivan, 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (quotation marks and citation omitted), and to safeguard "the individual's interest in self-expression." First Nat'l Bank v. Bellotti, 435 U.S. 765, 777 n. 12, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); see also Bose Corp. v. Consumers Union, 466 U.S. 485, 503-04, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ("[T]he freedom to speak one's mind is ... an aspect of individual liberty — and thus a good unto itself...."). Self-expressive speech is no more nor less likely than speech with an intended on-site audience to be "`basically incompatible with the normal activity of a particular [public forum] at a particular time,'" ACLU of Nevada v. City of Las Vegas, 333 F.3d 1092, 1100 (9th Cir.2003) (quoting Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)), cert. denied, 124 S.Ct. 1077 (2004). And where the communicative activity in a traditional public forum involves a large group of people, the gathering itself partakes of the basic attributes of communication in a public forum: "assembly, communicating thoughts between citizens, and discussing public questions." Hague, 307 U.S. at 515, 59 S.Ct. 954 (opinion of Roberts, J.). Communication among members of a group at a location chosen for its significance to their message is thus no less protected in public fora than any other speech.
 
 
 33
 This court and other courts of appeal have so recognized, applying traditional public forum analysis to protest activity where "the place represents the object of protest, the seat of authority against which the protest is directed," as well as where "the place is where the relevant audience may be found." Wolin, 392 F.2d at 90. In United States v. Griefen, 200 F.3d 1256 (9th Cir.2000), the defendants were deep in a National Forest, engaged in a protest against, inter alia, "the conduct, policies, and practices of the United States Forest Service." Id. at 1259. There is no indication that there was an on-site audience other than the co-defendants themselves and the construction workers at the site. Instead, the remote location was probably chosen for its symbolic significance to their message. See id. at 1258 (protestors were spotted only when officials of the Forest Service flew over the area to observe a construction project). We treated the case under the time, place, and manner standard applicable to communicative activities in a traditional public forum, citing Hague, Ward, and Grayned, all seminal traditional public forum cases. Griefen, 200 F.3d at 1260-62.
 
 
 34
 Similarly, in Olivieri v. Ward, 801 F.2d 602 (2d Cir.1986), protestors chose their location in front of St. Patrick's Cathedral to convey "[t]he message ... that they are members of the Catholic Church which they do not forsake because of their homosexuality." Id. at 606. The Second Circuit applied the traditional public forum time, place, and manner standard. Id. at 605; see also United States v. Johnson, 159 F.3d 892, 893-95 (4th Cir.1998) (applying traditional public forum time, place, and manner standard to the National Forest gathering of "a group that periodically gathers in natural surroundings, particularly to celebrate the solstices and equinoxes").
 
 
 35
 In sum, there is a strong First Amendment interest in protecting the right of citizens to gather in traditional public forum locations that are critical to the content of their message, just as there is a strong interest in protecting speakers seeking to reach a particular audience.
 
 
 36
 2. Application of Time, Place, and Manner Standard
 
 
 37
 The interesting constitutional issue presented by this case is the application of the time, place, and manner framework to a situation in which the protestors' interest in remaining at a particular location stems from the importance of that location to the content of their message, rather than their interest in reaching an audience likely to gather at that location. As the time, place, and manner standard evolved with more precision in recent years, that standard has been stated as the three-part test we quoted earlier: "To qualify as a permissible restriction, the regulation must be content neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the message." Baugh, 187 F.3d at 1042. There is no dispute here that the decision to relegate the prayer service to the "First Amendment area" was content-neutral. Rather, plaintiffs contest the district court's determinations on the second and third prongs of the time, place, and manner standard. We conclude that the Park Service's dispersal of the prayer service because of RWHP's refusal to retreat to the designated "First Amendment area" was not sufficiently narrowly tailored. As the location restriction on the prayer service was therefore unconstitutional, we do not reach the more difficult application of the third, "ample alternative channels" prong of the time, place, and manner test. See Sabelko v. City of Phoenix, 120 F.3d 161, 165 n. 3 (9th Cir.1997).
 
 
 38
 a. Narrow Tailoring
 
 
 39
 The narrow tailoring requirement has been refined since it was first announced in three respects: First, as long as the government's interest in a regulation of speech in a public forum is substantial, the regulation "need not be the least restrictive or least intrusive alternative." One World One Family Now v. City and County of Honolulu, 76 F.3d 1009, 1014 (9th Cir.1996) (quotation marks and citation omitted). So long as the governmental interests "would be achieved less effectively absent the regulation" and the regulation achieves its ends "without... significantly restricting a substantial quantity of speech that does not create the same evils," the regulation is sufficiently narrowly tailored. Ward, 491 U.S. at 799 & n. 7, 109 S.Ct. 2746. Second, although the regulation need not be minimally restrictive, the availability of several obvious less-restrictive alternatives is pertinent in deciding whether the regulation burdens substantially more speech than necessary to achieve its purposes. See Project 80's, Inc. v. City of Pocatello, 942 F.2d 635, 638 (9th Cir.1991). Third, where there is a generic regulation, its validity "need not be judged solely by reference to the demonstration at hand," but can also take into account the need for the regulation as applied to other speakers. Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 296-97, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); see also ACORN v. City of Phoenix, 798 F.2d 1260, 1270 (9th Cir.1986) ("Even if occasional solicitation of motorists by one group could be controlled with a maximum effort on the city's part, Phoenix may appropriately consider the cumulative impact if many other organizations likewise decided to engage in this activity on a pervasive or regular basis.").
 
 
 40
 In this instance, Baugh recognized that"[t]he government had a significant interest in protecting the Presidio's facilities and its users, including the protesters." 187 F.3d at 1043. This was a fairly large group of protestors. For a time, according to Sister Bernie's testimony, the group "was out in the street," although the record does not indicate that there were any cars in the vicinity then. There was at least one visitor to the Visitor Center while the RWHP group was in front of it; Hay testified that he "talked to one old gentleman in particular, he said he was a Presidio vet and he had come to see the Presidio that day. I told him we would escort him in and[he] declined and said he didn't want to bother." There was certainly the possibility, indeed, the likelihood, that more members of the public would come to the Visitor Center later on, and there was no way for the defendants to know how long the prayer service would continue. Additionally, had the RWHP group been permitted to use the lawn in front of the Visitor Center for their large protest, then other groups could claim such entitlement to use the area as well, on days when the massing of many people in the area in front of the Visitor Center would be more likely to impede access to the building. For all these reasons, the defendants had a significant interest in ensuring that the plaintiffs' prayer service was conducted so as not to impede access to the Visitor Center or use of the Presidio's roadways.
 
 
 41
 If we considered only the quantity of RWHP's speech impaired by the defendants, as Ward and other cases suggest,[10] we might conclude that the requirement that the prayer service reconvene at the "First Amendment area" did not burden substantially more speech than was necessary to meet the government's significant interests and was therefore valid. In conducting their prayer vigil, RWHP members, as noted, were not trying to reach an on-site audience. So if the "quantity" of speech refers to the ability of speakers to communicate the text of their message to their intended listeners, then there was essentially no burden on RWHP's speech. The audience was other protestors, and the protestors could have seen and heard each other in the "First Amendment area."
 
 
 42
 That view of the protection accorded speech in a public forum, however, cannot suffice to protect public forum speech of the kind we have here, namely, speech in which a chosen location is a critical aspect of the message communicated by speakers amongst themselves. We do not read any of the earlier cases as addressing this precise issue, or as mandating a quantitative approach to the narrow tailoring inquiry when that approach does not capture the First Amendment interest asserted. Instead, where, as here, "the location[is] an essential part of the message sought to be conveyed," Nationalist Movement, 12 F.Supp.2d at 192, a court must consider the degree of distortion of the message conveyed that is effected by the regulation in question.
 
 
 43
 With that focus in mind, we conclude that the requirement for RWHP to use the "First Amendment area" did burden its speech to a substantially greater degree than was needed to achieve the government's purposes. One can see the Visitor Center from the "First Amendment area" but the sight line was partially obstructed by trees, and the view is from a distance equivalent to two city blocks (assuming 20 blocks to a mile).[11] In addition, the view from the "First Amendment area" was at an oblique angle rather than head-on, yet another feature hardly conducive to RWHP's message concerning the authority represented by the building.
 
 
 44
 Hay testified that the protestors, had they asked, would have been allowed to use the much closer parking lot just across the street, directly in front of the Visitor Center. That obvious alternative would have distorted RWHP's witnessing considerably less, as the connection between the Visitor Center and the protest activity would have been maintained. Multiple obvious alternatives can inform the tailoring inquiry. See Project 80's, 942 F.2d at 638. Similarly, the fact that the defendants themselves recognized that day the availability of the parking lot alternative as sufficient to meet the Park Service's purposes, yet failed to offer it to the protestors, supports our conclusion that the requirement imposed was not sufficiently narrowly tailored under the circumstances.
 
 
 45
 By way of comparison, the restriction we upheld in Griefen involved a different and stronger governmental interest: "Faced with a clear and present threat to health and safety and property, the Forest Service appropriately established a limited security zone around the danger area." 200 F.3d at 1261 (emphasis added). In Griefen, moreover, because the message depended on a connection between the protestors and the Nez Perce Forest and that connection was maintained, the location-specific aspects of the message were adequately preserved. See id. at 1262 ("Having to move 150 feet from a construction area made dangerous by illegal destructive behavior did not substantially burden the appellants' rights.").
 
 
 46
 Here, the "First Amendment area" was more than three times as far removed from the Visitor Center as were the protestors in Griefen from their chosen location. See id. at 1260 ("The protestors were not ejected from the forest or even from the vicinity of the construction site, only from 150 feet to each side of the center of the work zone."). Unlike in Griefen, where the protestors were free to encircle the object of their expression at will, RWHP members were given only one option. As the "First Amendment area" was located so that the visual connection with the Visitor Center was partially obstructed, remote, and oblique, the protestors' message of confronting the authority represented by the building was inhibited to an extent greatly exceeding that permitted in Griefen.
 
 
 47
 We therefore conclude that the relegation of the prayer service to the "First Amendment area" burdened the plaintiffs' speech to a substantially greater degree than necessary to achieve the Park Service's purposes.
 
 
 48
 b. Ample Alternative
 
 
 49
 The third prong of the time, place, and manner standard as traditionally stated asks whether the "First Amendment area" restriction left "open ample alternative channels for communication of the information." ACLU of Nevada, 333 F.3d at 1106 (quoting Ward, 491 U.S. at 791, 109 S.Ct. 2746). The foregoing analysis suggests that focusing, as the cases almost uniformly do,[12] on the ability of the speakers to reach their intended audience is inapposite for this third prong as well.
 
 
 50
 Ward's use of the term "channels" of communication suggests such an audience-focused approach, perhaps. See 491 U.S. at 802, 109 S.Ct. 2746. Yet, for the reasons already stated, we do not believe that restrictions on speech in public fora are permitted without regard to the impact on the content of the message itself, even if the intended audience is non-existent or is only the other members of a protesting group. Ward itself so recognizes. See id. ("[T]he guideline continues to permit expressive activity in the bandshell, and has no effect on the quantity or content of that expression beyond regulating the extent of amplification." (emphasis added)). Rather, analysis of time, place, and manner restrictions should include an inquiry into whether the regulation so alters the content of a message in a public forum as to hamper speakers from conveying what they mean to convey.
 
 
 51
 We so assumed in Griefen without explicitly flagging the issue. In Griefen, we did not ask, as in Bay Area Peace Navy and similar cases, whether the regulation in question preserved the ability to convey the message to an intended, on-site audience. Instead, our inquiry was whether the "tailoring left [the protestors] with ample opportunities in the Nez Perce Forest and elsewhere lawfully to express their views." 200 F.3d at 1261 (emphasis added). That approach frames the issue more appropriately than the traditional formulation when the impairment of speech consists not of interference with transmission of a message to an on-site audience but of asserted interference with the content of the message through severance of the speech from a location critical to that content. More precisely, the question must be whether the regulation prevents the speakers from expressing their views, where that expression depends in whole or part on the chosen location.
 
 
 52
 Applying that standard here, there are strong arguments both favoring a conclusion that First Amendment rights were violated and opposing that conclusion. On the one hand, as noted with regard to the narrow tailoring issue, the protestors' relegation to the "First Amendment area" seriously distorted the intended incorporation of the location into RWHP's message. On the other hand, the demonstrating RWHP members retained some ability to connect their message to the venue that was critical to its content; the building was visible from the area where they were permitted to speak, although faintly, obliquely, and with partial obstruction.
 
 
 53
 Ultimately, we need not decide whether the defendants left ample alternatives for expression of RWHP's message, as the defendants' directive in any event failed the narrow tailoring inquiry for reasons already surveyed. The directive was therefore a violation of plaintiffs' free speech rights.
 
 
 54
 c. Clearly Established Law
 
 
 55
 There is qualified immunity for the narrow tailoring violation if the law at the time of the events in question was not "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope, 536 U.S. at 739, 122 S.Ct. 2508 (quotation marks and citation omitted). "The relevant question... is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the prayer service dispersal] to be lawful, in light of clearly established law and the information the... officers possessed." Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).
 
 
 56
 In the context of the case law established in March 1997, the application of the time, place, and manner standard to circumstances in which location rather than audience is essential to the message being conveyed compels the conclusion that a reasonable official would not have had sufficiently clear legal guidance to avoid violating the plaintiffs' constitutional rights. As explicated above, cases prior to Griefen that applied the time, place, and manner standard emphasized the communication of a message to an audience, rather than the content-related impact of a chosen location, and took a quantitative rather than qualitative approach to the narrow-tailoring inquiry. Although the defendants were wrong in their assumption that terminating the prayer service was a narrowly tailored response to the threatened governmental interests, their error was not unreasonable given the law as clearly established in March 1997. A reasonable official could have distinguished Bay Area Peace Navy's prohibition of a 75-yard restriction on protest targeting an intended audience on the ground that RWHP had no apparent audience, so that the relocation of their prayer service did not substantially burden their speech. It was not until our decision in Griefen that we analyzed time, place, and manner restrictions as they apply to site-specific expressive interests without regard to the opportunity to reach an on-site audience. Until then, the constitutional right violated by the defendants was not clearly established. The defendants are therefore entitled to qualified immunity for the narrow tailoring violation.
 
 
 57
 Moreover, even if we were to hold that the "First Amendment area" did not provide an "ample alternative" for the communication of RWHP's message, this violation would not lead to liability for the defendants either. "`Clearly established' for purposes of qualified immunity means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Beier v. City of Lewiston, 354 F.3d 1058, 1068 (9th Cir.2004) (quotation marks and citation omitted). Our application of the time, place, and manner standard to the circumstances of this case demonstrates that the right violated by the defendants — be it the second or the third prong of the standard — has contours that were clearly established only subsequent to the events in question.
 
 
 58
 The central difference between the plaintiffs' claim and that accepted in cases such as Bay Area Peace Navy is the absence of communication with an on-site audience. See Bay Area Peace Navy, 914 F.2d at 1229 ("An alternative is not ample if the speaker is not permitted to reach the `intended audience.'"). The manner in which this distinction affects First Amendment time, place, and manner analysis is, as outlined above, similar for both narrow tailoring and ample alternatives. We therefore conclude, without deciding whether there was a violation of the "ample alternatives" prong, that qualified immunity would apply even to any hypothetical violation by the defendants, because the law of "ample alternatives" in the absence of an audience was not clearly established in March 1997.
 
 
 59
 The defendants are therefore entitled to qualified immunity on the plaintiffs' First Amendment Bivens cause of action.
 
 II
 
 Federal Tort Claims Act
 
 
 60
 The government argues that we lack jurisdiction over plaintiffs' FTCA claim because the United States has not waived its sovereign immunity from lawsuits, invoking the "discretionary function" exception to FTCA jurisdiction. See 28 U.S.C. § 2680(a); Nurse v. United States, 226 F.3d 996, 1000 (9th Cir.2000) ("If appellant's causes of action fall within one or more of the[] exceptions [contained in the FTCA], then the federal courts lack subject matter jurisdiction to hear her claims."). We have already held that the defendants violated the Constitution by dispersing the plaintiffs' prayer service. "In general, governmental conduct cannot be discretionary if it violates a legal mandate. ...[T]he Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply." Nurse, 226 F.3d at 1002 & n. 2. As "[f]ederal officials do not possess discretion to violate constitutional rights," United States Fid. & Guar. Co. v. United States, 837 F.2d 116, 120 (3d Cir.) (cited in Nurse, 226 F.3d at 1002), cert. denied, 487 U.S. 1235 (1988), the discretionary function exception does not apply here.[13]
 
 
 61
 The FTCA specifically permits liability for false arrest when effected by federal law enforcement officers. See 28 U.S.C. § 2680(h). Under the Act, "[l]iability is determined by the tort law of the state where the claim arose." Gasho v. United States, 39 F.3d 1420, 1427 (9th Cir.1994). This case arose in California, where the law "protects a law enforcement officer from liability for false arrest ... where the officer, acting within the scope of his or her authority, either (1) effects a lawful arrest or (2) has reasonable cause to believe the arrest is lawful." Cervantes v. United States, 330 F.3d 1186, 1188 (9th Cir.2003).
 
 
 62
 The defendants argue that they properly arrested the RWHP members, who were violating 36 C.F.R. § 2.51(a)'s prohibition against demonstrations without a permit. Given our conclusion above that the defendants' permit denial was not a violation of clearly established law, the officers "had reasonable cause to believe the arrest was lawful." Cal. Pen.Code § 847(b)(1). We therefore affirm the district court's dismissal of the FTCA claim.[14]
 
 CONCLUSION
 
 63
 For the foregoing reasons we affirm the district court's rulings on qualified immunity and liability under the FTCA. We therefore affirm the grant of summary judgment.
 
 
 64
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation
 
 
 [1]
 The relevant regulations, unchallenged here, are found at 36 C.F.R. § 2.51 and provide in relevant part:
 (a) Public assemblies, meetings, gatherings, demonstrations, parades and other public expressions of views are allowed within park areas, provided a permit therefor has been issued by the superintendent.
 . . .
 (c) The superintendent shall, without unreasonable delay, issue a permit on proper application unless:
 (1) A prior application for a permit for the same time and place has been made that has been or will be granted and the activities authorized by that permit do not reasonably allow multiple occupancy of that particular area; or
 (2) It reasonably appears that the event will present a clear and present danger to the public health or safety; or
 (3) The event is of such nature or duration that it cannot reasonably be accommodated in the particular location applied for, considering such things as damage to park resources or facilities, impairment of a protected area's atmosphere of peace and tranquillity, interference with program activities, or impairment of public use facilities.
 . . .
 (e) The superintendent shall designate on a map, that shall be available in the office of the superintendent, the locations available for public assemblies. Locations may be designated as not available only if such activities would:
 (1) Cause injury or damage to park resources; or
 (2) Unreasonably impair the atmosphere of peace and tranquillity maintained in wilderness, natural, historic or commemorative zones; or
 (3) Unreasonably interfere with interpretive, visitor service, or other program activities, or with the administrative activities of the National Park Service; or
 (4) Substantially impair the operation of public use facilities or services of National Park Service concessioners or contractors; or
 (5) Present a clear and present danger to the public health and safety.
 
 
 [2]
 The Park Service's Compendium of Regulations for the Presidio sets out the location of these predesignated areasSee United States v. Baugh, 187 F.3d 1037, 1041 (9th Cir.1999) ("The compendium of implementing regulations designates three locations within the Presidio for which the Park Service will issue permits for First Amendment activities."). The parties stipulated that the Compendium and Park Service practice allow for "floating permits" to cover areas other than the predesignated "First Amendment areas," but that once the negotiations concerning the demonstration reached an impasse "neither side raised the possibility of continuing the plaintiffs' protest activity in any third location, such as the parking lot across from the headquarters building."
 
 
 [3]
 All references to testimony in this opinion are taken from the protestors' criminal trial
 
 
 [4]
 Although the plaintiffs brought this action "as a class," there has been no certification of the class. It appears that all four of the plaintiffs were arrested and convictedSee Baugh, 187 F.3d at 1037 (listing Bernie Galvin, Ken Butigan, Jeff Johnson, and Karen Oliveto in the caption as defendants). We therefore do not address the statute of limitations question decided by the district court. That question concerns only demonstrators who were not arrested and convicted. There is no dispute that this suit was timely with respect to demonstrators who were arrested and convicted because, as the parties stipulated, no cause of action for such individuals accrued until their convictions were reversed. See Heck v. Humphrey, 512 U.S. 477, 489, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).
 
 
 [5]
 Thomas v. Chicago Park District, 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002), does not affect our analysis of the prayer service dispersal. The Court in Thomas considered only a challenge to the breadth of official discretion, not "requirements of our time, place, and manner jurisprudence." Id. at 323 n. 3, 122 S.Ct. 775.
 
 
 [6]
 See, e.g., Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 643, 655, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (holding with respect to a state fair, "a major public event ... attract[ing] visitors from all over Minnesota as well as from other parts of the country," that "[t]he First Amendment protects the right of every citizen to reach the minds of willing listeners and to do so there must be opportunity to win their attention" (quotation marks and citation omitted)); Schneider v. New Jersey, 308 U.S. 147, 154, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (noting in a case where the appellant "distributed handbills to pedestrians" that "the streets are natural and proper places for the dissemination of information and opinion"); ACLU of Nevada v. City of Las Vegas, 333 F.3d 1092, 1106 (9th Cir.2003), cert. denied, 540 U.S. 1110, 124 S.Ct. 1077, 157 L.Ed.2d 897 (2004) (upholding plaintiffs' challenge to, inter alia, an ordinance prohibiting leafleting "to passersby" in a publicly-owned pedestrian mall); Edwards v. City of Coeur d'Alene, 262 F.3d 856, 867 (9th Cir.2001) (concluding that an ordinance provided a demonstrator "no other effective and economical way ... to communicate his or her message to a broad audience during a parade or public assembly" when it prohibited "attach[ing] a handle to his [or her] sign to hoist it high in the air" (emphasis added)); One World One Family Now v. City and County of Honolulu, 76 F.3d 1009, 1014-15 (9th Cir.1996) ("Nothing prevents plaintiffs here from reaching their intended audience-the tourists congregating in Waikiki."); Gerritsen v. City of Los Angeles, 994 F.2d 570, 573 (9th Cir.1993) ("Gerritsen has distributed his literature and made speeches in a variety of cities and parks in the Los Angeles area, but El Pueblo Park is one of his favorite sites because of its many Mexican American and Mexican visitors."); Gaudiya Vaishnava Soc. v. City and County of San Francisco, 952 F.2d 1059, 1060 (9th Cir.1990) (enjoining a permit requirement for the sale of certain merchandise at tourist destinations because it affected activities of groups such as Greenpeace, which "sets up tables ... to bring its message to the general public and solicit financial contributions and membership" (emphasis added)).
 
 
 [7]
 See, e.g., Schenck v. Pro-Choice Network, 519 U.S. 357, 362, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) ("[D]efendants had consistently engaged in ... blockades ... at facilities in the Western District of New York where abortions were performed."); Carey v. Brown, 447 U.S. 455, 457, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (protestors "participated in a peaceful demonstration on the public sidewalk in front of the home of [the] Mayor of Chicago"); Glendale Assocs., Ltd. v. NLRB, 347 F.3d 1145, 1147 (9th Cir.2003) ("[U]nion representatives from Local 57 distributed handbills to customers outside of the Disney Store in the Glendale Galleria...."); Foti v. City of Menlo Park, 146 F.3d 629, 633 (9th Cir.1998) (appellants "regularly picket and leaflet on a public sidewalk in the City of Menlo Park ... in front of a Planned Parenthood facility"); see also Weinberg v. City of Chicago, 310 F.3d 1029, 1042 (7th Cir.2002) ("The United Center is a unique location for the sale of Weinberg's book, especially since the target market for his book is [Chicago] Blackhawk [hockey] fans."); Students Against Apartheid Coalition v. O'Neil, 660 F.Supp. 333, 339-40 (W.D.Va. 1987), aff'd 838 F.2d 735 (4th Cir.1988) (holding that university prohibition on erection of symbolic shanties on lawn of building where Board of Visitors met was not made constitutional by permission to erect shanties elsewhere on campus, in a location not visible to members of the Board); New Alliance Party v. Dinkins, 743 F.Supp. 1055, 1066 (S.D.N.Y. 1990) (concluding that alternative protest location was inadequate because it permitted "only a glimpse of the northern corner of [Gracie] Mansion" where the intended audience was located).
 
 
 [8]
 The court inBaugh regarded "[t]he Park Service officials and the public ... at the Visitor Center" as the intended audience and held that the 150 to 175-yard distance between the Visitor Center and the First Amendment area was too great to allow RWHP to reach that audience. 187 F.3d at 1044. The plaintiffs in this appeal have crafted their First Amendment claim differently so that it is consistent with the facts they have chosen to present, as they are entitled to do. Neither party has invoked issue preclusion based on Baugh, see Deutsch v. Flannery, 823 F.2d 1361, 1364 n. 2 (9th Cir.1987) ("Issue preclusion is an affirmative defense that may be waived if not pleaded."), and we do not do so sua sponte, particularly given that the individual defendants here were not parties in Baugh. See Disimone v. Browner, 121 F.3d 1262, 1268 (9th Cir.1997) ("Courts are granted broad discretion to apply the doctrine of collateral estoppel."); Robi v. Five Platters, Inc., 838 F.2d 318, 322 (9th Cir.1988) (holding that a court has no obligation to raise preclusion on its own).
 
 
 [9]
 Several Supreme Court cases from the era of the civil rights movement implicitly recognized this critical connection between message and public locationsSee, e.g., Brown v. Louisiana, 383 U.S. 131, 139, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (opinion of Fortas, J.) (reversing convictions where protestors "sat and stood in the [reading] room, quietly, as monuments of protest against the segregation of the [public] library"); Cox v. Louisiana, 379 U.S. 559, 560, 566, 575, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (reversing convictions under a statute prohibiting "pickets or parades in or near a building housing a court of the State of Louisiana" for a "demonstration [that] was held in the vicinity of the courthouse where the students' trials would take place"); Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (reversing convictions for breach of the peace where "[t]he petitioners felt aggrieved by laws of South Carolina which allegedly `prohibited Negro privileges in this State.' They peaceably assembled at the site of the State Government and there peaceably expressed their grievances `to the citizens of South Carolina, along with the Legislative Bodies of South Carolina.'" (emphasis added) (footnote omitted)). Compare Adderley v. Florida, 385 U.S. 39, 45, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (upholding convictions where a "particular jail entrance and driveway were not normally used by the public" (emphasis added)).
 
 
 [10]
 See Ward, 491 U.S. at 802, 109 S.Ct. 2746 ("[T]he guideline continues to permit expressive activity in the bandshell, and has no effect on the quantity or content of that expression beyond regulating the extent of amplification."); Foti, 146 F.3d at 641 ("While each restriction may diminish the amount of speech that Foti and Larsen individually may make on the abortion issue, they do not reduce the total quantum of speech on a public issue." (quotation marks and citation omitted)); Perry v. Los Angeles Police Dep't, 121 F.3d 1365, 1371 (9th Cir.1997) ("[T]he nonprofit distinction significantly restricts a substantial quantity of speech — namely expressive speech by people who are not nonprofit members — that does not create the same evils as purely commercial activity on the Boardwalk...."); One World, 76 F.3d at 1014 ("Because the peddling ordinance addresses these problems `without ... significantly restricting a substantial quantity of speech that does not create the same evils,' [it] is narrowly tailored." (citation omitted)); Grossman, 33 F.3d at 1207-08 ("Because section 010 `restricted a substantial quantity of speech that [did] not impede [the City's] permissible goals,' it is unconstitutional." (citation omitted)).
 
 
 [11]
 Our analysis is somewhat hampered by the parties' agreement at oral argument in the district court "that the Court should incorporate its knowledge [of the layout of the Presidio and the area comprising the Visitor Center and the First Amendment area] into the legal conclusion regarding whether a reasonable officer in the defendants' position could believe that his conduct was lawful." This stipulation creates a dilemma for us as a reviewing court, as we have no means of determining exactly what the district judge knows about the layout of the Presidio. The judge's "familiarity" informed his legal conclusion, yet we are constrained to reviewde novo the court's grant of summary judgment on the qualified immunity question. See Balint, 180 F.3d at 1050. Fortunately, there are photographs and a map in the record that suffice for us to make the requisite determinations concerning the layout of the spaces in front of the Visitor Center and of the "First Amendment area."
 
 
 [12]
 See, e.g., Bay Area Peace Navy, 914 F.2d at 1229 ("The Peace Navy cannot employ effective alternative water-borne methods of communicating with the audience on the pier...."); see also One World, 76 F.3d at 1014 ("[T]he ordinance forecloses one narrow form of expression — side — walk sales of message-bearing merchandise — and leaves the plaintiffs free to disseminate and seek financial support for their views through myriad and diverse alternative channels...." (quotation marks and citation omitted)); Gerritsen, 994 F.2d at 577 ("Gerritsen could leaflet in other areas of the park or, presumably, he could use methods other than handbills to express his political views.").
 
 
 [13]
 See also Thames Shipyard & Repair Co. v. United States, 350 F.3d 247, 254-55 (1st Cir. 2003) ("[C]ourts have read the Supreme Court's discretionary function cases as denying protection to actions that are unauthorized because they are unconstitutional, proscribed by statute, or exceed the scope of an official's authority." (citing, inter alia, Nurse)); Raz v. United States, 343 F.3d 945, 948 (8th Cir.2003) (discretionary function exception does not apply because plaintiff alleged that conduct violated his constitutional rights); Medina v. United States, 259 F.3d 220, 225 (4th Cir.2001) (In "determin[ing] the bounds of the discretionary function exception found in § 2680(a) ... we begin with the principle that federal officials do not possess discretion to violate constitutional rights or federal statutes." (quotation marks and citations omitted)); Myers & Myers, Inc. v. United States Postal Serv., 527 F.2d 1252, 1261 (2d Cir.1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority.").
 
 
 [14]
 While the district court's ruling, rendered beforeNurse was decided, was based on an analysis of the discretionary function exception to the FTCA, we may affirm on any ground supported by the record. Serrano v. Francis, 345 F.3d 1071, 1076-77 (9th Cir. 2003).